IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. PO510062, PO510063 |
| | ) | (SHIRLEY) |
| V. | ) | |
| | ) | |
| MARCI DIANE PACE, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This matter came before the Court on Defendant Marci Pace's Motion to Suppress [Doc. 2]. Ms Pace challenges the validity of the traffic stop that led to the instant charges of Driving Under the Influence of an Intoxicant and Violation of Implied Consent Law in the Great Smoky Mountains National Park on February 28, 2007. The United States opposes the motion to suppress at [Doc. 7]. The Court conducted an evidentiary hearing on the merits of this motion. Ms. Pace was present at the hearing along with her attorney, Joseph A. Baker. The government was represented by Assistant United States Attorney Robert E. Simpson.

The Court received testimony from National Park Service Ranger Robert Fleming and received one exhibit into evidence; arguments were made by Attorney Baker and AUSA Simpson. Given the importance of the factual details of the automobile stop to this motion to suppress, and the importance of accuracy, the parties requested leave to file post-hearing briefs

1

in light of the record established, and the Court took this matter under advisement after receiving such supplemental argument.

The record before the Court is as follows.

## I. <u>FACTS</u>

On February 28, 2007, Ranger Robert Fleming (Fleming) was on patrol duty in the Great Smoky Mountains National Park. Fleming was stationed in his patrol car along the four-lane U.S. Highway 441 between Pigeon Forge and Gatlinburg, a short stretch of highway known as "the Spur." [Tr. 4]. Fleming was monitoring traffic on the Spur using a radar device.

Around 11 o'clock that night, Fleming was pulled off the Spur roadway at the Little Smoky Exit doing paperwork in his car, which was parked facing North with its parking lights on . [Tr. 6]. Fleming became aware of cars approaching along the Spur and when he glanced up from his paperwork at the radar device it registered a speed of 70 - 72 m.p.h. as three or four vehicles passed. [Tr. 7]. Fleming testified that he pulled out onto the Spur and fell in behind the group of cars, but that he did not intend to stop any of them for speeding because he was not sure which one had been traveling 70 - 72 m.p.h. Fleming testified that as he pulled in behind the cars, one of them turned off the Spur onto Legion Field Bridge [Tr. 7]. Fleming continued northbound behind the remaining three cars, primarily for the purpose of slowing them down and keeping them within the speed limits. [Tr. 8].

Fleming testified that as he followed the vehicles, one of them "kind of drove off the right side of the road." [Tr. 8]. Fleming elaborated that he was traveling in the left, or passing, lane when he observed this car, traveling in the right, or slow, lane "almost leave off the right side of the road." [Tr. 9]. Fleming then change to the slow lane and followed behind the subject vehicle, a Mercury with Tennessee license tags. Fleming also described the driving behavior as

2

crossing to the shoulder of the right lane and testified that "I could see dust kick up." [Tr. 10]. This took place just before the group of cars entered a tunnel. As he made the decision to focus his observations on this vehicle, Fleming activated his in-cruiser camera. [Tr. 10].

Fleming then followed the defendant about two miles before he activated his emergency blue lights to stop the Mercury. Fleming testified that he was stopping the Mercury "to check the driver for sobriety, that they were weaving, and to see if the driver was alright to operate the vehicle." [Tr. 11]. With respect to the description of "weaving," Fleming explained that prior to the stop, the car stayed within its own lane, with the one exception of crossing the fog line to the right before entering the tunnel. [Tr. 11]. Fleming testified that the Mercury came to a stop for the blue-lights "just inside the city limits of Pigeon Forge." [Tr. 12].

The government then played part of the in-cruiser videotape and offered it into evidence as Exhibit 1 to the hearing. The videotape begins after the cars passed through the tunnel (which was after the driving behavior that attracted the ranger's attention to the Mercury). The videotape depicts the subject vehicle driving within its lane of travel. While the vehicle does not travel along in a perfectly a straight line, it is not observed crossing either the right or left border lines. When asked why he did not stop the vehicle after he originally noticed what he termed "weaving in the lane", Ranger Fleming testified:

> I typically want to give somebody a second chance. I thought maybe that area, prior to the tunnel, maybe it was a tourist, they weren't sure where they were going, because there's an exit at Beech Branch. So I wanted to give them some more time to watch, I wanted to give them more time to straighten out their driving. If they had straightened out the driving, I wouldn't have made a stop, would have just continued on my way. So I wanted to give them more time. [Tr. 15]

3

Fleming also testified that there was an earlier safe place at which he might have conducted the traffic stop, but that it was not as safe a spot for the standardized field sobriety tasks. [Tr. 16].

On cross-examination, Fleming confirmed that he was unable to discern which of the original group of cars was driving 70 m.p.h. as they passed him just outside the city limits of Gatlinburg traveling North. [Tr. 17]. Fleming followed the group of cars for about a mile and a half before they reached the tunnel. During this stretch, the only noticeable driving behavior was the sole incidence of dust kicking up to the right side of the Mercury, as previously described. [Tr. 18]. Fleming confirmed that at times there is dirt and debris on the roadway along the Spur [Tr.19]. Fleming testified that he did not actually see the wheels of the Mercury travel over the fog line because he was positioned in the passing lane, diagonal to the Mercury, [Tr. 18], and offered the following additional testimony upon cross examination by Mr. Baker regarding the driving he observed:

> Q. But to be clear, sir, you did not see the Mercury's tires leave the road; you only saw the dust, fair?
>
> A. Yes.
>
> Q. And as the Mercury approached the tunnel, you've testified, that the Mercury was traveling at a safe speed?
>
> A. Yes.
>
> Q. A lawful speed. And, in fact, you did not observe any violations of the law as you approached the tunnel?
>
> A. No
>
> Q. And as the vehicle drove through the tunnel, you didn't observe any violations of the law?
>
> A. No.

> Q. And in fact, you've testified that after leaving the tunnel you followed the vehicle about two miles?
>
> A. Yes.
>
> Q. And we watched that video?
>
> A. Yes.
>
> Q. And during that two mile period, again there were no violations of the law that you observed?
>
> A. I could have stretched to unsafe operations, weaving, going off the right side of the road.
>
> Q. But that would have been a stretch, fair?
>
> A. And that's why I didn't, yeah
>
> Q. And, in fact, as that car traveled those two miles on the Spur, northbound, you only noticed weaving within the lane?
>
> A. Yes.
>
> Q. Within the Mercury's lane of travel?
>
> A. Yes.
>
> Q. Never did the Mercury leave its lane of travel after the tunnel?
>
> A. It never left the left side, but on the right side it actually would drive off onto the markers on the right side.
>
> [Tr. 19 – 20]

Fleming testified that, in total, he followed the Mercury for about two miles, during which he only observed the one driving event. [Tr. 20]. He also testified that the driving captured on the videotape after the Mercury left the tunnel was consistent with the driving he

5

observed before the tunnel, with the exception of the shoulder violation.[1] [Tr. 21]. Fleming admitted that it was only fair to say that he saw the dust coming up behind the Mercury and not that he saw the vehicle leave the road. [Tr. 21]

Fleming agreed that the roadway leading up to the tunnel includes "some sharp curves." [Tr. 21]. Fleming confirmed that the place where he saw the dust fly up was itself in a sharp curve in the road. [Tr. 21]. Further, leading up to the spot where the dust was observed, three sharp curves must be negotiated in succession. [Tr. 21]. Fleming agreed that vehicles traveling the speed limit can have operational difficulties going through these curves. [Tr. 22]. Fleming explained that this was one reason he continued to follow the Mercury for a time before stopping it at the end of the Spur. [Tr. 22]. Fleming testified in agreement that there were at least three other places he could have stopped the Mercury before he did, had he considered it a danger to others on the roadway. [Tr. 23-24]. Instead, he waited three and a half to four miles before making the stop. [Tr. 24].

On re-direct examination, Fleming testified that weaving within one's own lane can be a signal of intoxication, according to his training in detection of impaired drivers. He also added that there are several factors, none of which he testified applied here, except for a brief reference to having seen the Mercury following another vehicle too closely before entering the tunnel, but not after the tunnel. [Tr. 25 - 26].

---

1 The Court has reviewed the videotape, Exhibit 1 to the suppression hearing, several times based on the representation of it being an accurate recording of the driving observed by Ranger Fleming, according to his testimony [Tr. 20], and has accorded it substantial weight. The Court notes from its own observations there is little evidence of the "weaving" testified to by Ranger Fleming despite the number of curves encountered, and particularly little "weaving" in the straightaways. In fact, based on the movement of the video camera, the defendant's car does not seem to weave much more, if it does at all, than the ranger's vehicle. C.f, Scott v. Harris, 127 U.S. 1769, fn 5 (2007) ("[w]e are happy to allow the videotape to speak for itself").

On re-cross examination, Ranger Fleming agreed that he had never mentioned observing the Mercury following too closely in his reports or his narrative of the events and agreed that the purpose of his stop was the weaving inside the lane and the dust he saw. [Tr. 26].

## II. <u>ANALYSIS</u>

The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968); <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981). The stop of an automobile and the detention of its occupants constitutes a seizure within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief. <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996); <u>Delaware v. Prouse</u>, 440 U.S. 648, 663 (1979); <u>United States v. Martinez-Fuerte,</u> 428 U.S. 543, 556-58 (1976). Finding that Ms. Pace was seized when her vehicle was stopped by Ranger Fleming, calling into operation the protections of the Fourth Amendment, the Court must next determine whether that traffic stop seizure was reasonable.

A seizure conducted without a warrant is presumed unreasonable. <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55 (1971). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless the government proves by a preponderance of the evidence that the search was reasonable. <u>Id</u>. Generally, for the seizure of an automobile and occupants to be reasonable, there must be some type of individualized suspicion of wrongdoing justifying the seizure.

If an officer has probable cause to believe that a violation of the traffic code has occurred or was occurring, a resultant stop is not unlawful and does not violate the Fourth Amendment. <u>United States v. Graham</u>, 483 F.3d 431 (6th Cir. 2007). This is so even if the stop is a complete

7

pretext for the officer's subjective motivations in making the stop. Whren, 517 U.S. at 813-17. Similarly, it has been deemed reasonable to temporarily seize an automobile and occupants for investigation in the absence of probable cause if a police officer has reasonable suspicion, based on specific and articulable facts, that the occupants have been involved in or are about to be involved in criminal activity. See Ornelas v. United States, 517 U.S. 690, 693 (1996); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether police may also stop a vehicle based on mere *reasonable suspicion* of a traffic violation is, as described by the Sixth Circuit, "the subject of another conflict in our case law." Gaddis v. Redford Tp., 364 F.3d 763 (6th Cir. 2994); United States v. Sanford, 476 F.3d 391, 394 -395 (6th Cir. 2007) (citing for comparison, Weaver v. Shadoan, 340 F.3d 398 at 407-08 (upholding stop where police had "reasonable suspicion" of a violation of vehicle registration and window tinting regulations); United States v. Freeman, 209 F.3d 464 at 466 (invalidating stop where police lacked "probable cause" to stop vehicle for failure to stay in lane); and United States v. Ferguson, 8 F.3d 385 at 391 (stating, in what the court describes as dictum, that probable cause is required for a stop premised on traffic violation)).

In Gaddis, the Sixth Circuit found the officer who initiated the stop of Gaddis' vehicle had reasonable suspicion to believe he was driving under the influence. The court stated that "[r]easonable suspicion to stop a vehicle depends on a contextual inquiry that considers, in the well-known phrase, "the totality of the circumstances-the whole picture." Gaddis, 364 F.3d at 771 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). The officer in Gaddis observed the vehicle weave twice to the left to touch the roadway's dividing line "in a fairly short span." Id. Also, Gaddis was driving slower than other traffic on the road and was leaning over to the right side inside his car. Id. Each of these facts, though they may each be innocent enough, taken together, "contribute[] to the overall picture created by the other evidence of

drunk driving" and established reasonable suspicion. Gaddis, 364 F.3d at 771, fn7. In Ms. Pace's case, other than her actions in her own lane, the officer observed only one alleged driving irregularity when he saw dust kick up on the right side (but did not actually see the vehicle cross the fog line). Standing alone, it was not compelling enough to establish reasonable suspicion of drunk driving.

In Sanford, the suspected violation was a misdemeanor traffic offense in violation of Tenn. Code Ann. § 55-8-124, the "following too closely" statute. Because the court concluded the officer, under those facts, had probable cause to believe a traffic violation occurred, the court declined to reach the issue of the proper standard, holding "it is unnecessary for us to resolve this issue between the reasonable suspicion and probable cause standards at this time." Sanford, 476 F.3d at 395.

Conversely, this Court is not required to determine whether Ranger Fleming did, or must, possess probable cause for the traffic stop at issue, because the Court finds that Ranger Fleming did not have reasonable suspicion: he did not stop the vehicle as the result of "specific and articulable facts which, taken together with rational inferences from those facts, [giving] rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity." United States v. Hurst, 228 F.3d 751, 757 (6th Cir.2000); see United States v. Cortez, 449 U.S. 411, 417-18 (1981). The facts presented to Ranger Fleming at the time of the stop did not rise to the level of "reasonable suspicion."

"Reasonable suspicion" has been described by the Sixth Circuit as "specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity." United States v. Barrett, 890 F.2d 855, 860 (6th Cir.1989); United States v. Hurst, 228 F.3d 751

9

(6th Cir. 2000). In reviewing the stop, "the totality of the circumstances-the whole picture-must be taken into account." Hurst, 228 F.3d at 757. "[T]he facts are judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" Id. (internal quotations omitted); see also United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Cohen, 481 F.3d 896, 898 -899 (6th Cir. 2007) citing Arvizu, 534 U.S. at 273. At the end of the day, however, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981); Brown v. Texas, 443 U.S. 47, 51 (1979); Delaware v. Prouse, 440 U.S. 648, 661 (1979); United States v. Brignoni-Ponce, 422 U.S. 873, 884 )1975); Adams v. Williams, 407 U.S. 143, 146-149 (1972); Terry v. Ohio, 392 U.S., at 16-19.

The United States argues that "Ranger Fleming would have been derelict in his duties if he had not stopped defendant's vehicle after following it for at least two miles and seeing that it continually weaved in its lane," rather than wait for a traffic accident to occur. Government's Additional Memorandum Brief [Doc. 7 at 4]. The Court finds that while driver safety is an important goal, the officer also is imbued with a duty to stop only those vehicles which he is justified by some objective manifestation to believe that the person stopped is, or is about to be, engaged in criminal activity. The officer's subjective impression of a potential for harm does not rise to the level of reasonable suspicion and, further, bears the imprimatur of a "stop at will" standard with good intentions.

As with the traffic stop in Stanford, "[t]he totality of the circumstances" in this case consists of a limited set of facts" from which to adduce an objective manifestation that Ms. Pace was involved in criminal activity. Sanford, 476 F.3d at 394. Ranger Fleming testified that he

followed the group of cars for at least two, and up to four, miles before he stopped the Mercury driven by Ms. Pace. During this time the only notable observation made was a single incidence of dust kicked up from the shoulder on the far side of the roadway, leading Ranger Fleming to believe the Mercury had driven over the shoulder line. This was seen after a series of sharp curves in the roadway, while the car was in the process of navigating another sharp curve.

Ranger Fleming stopped the car for "weaving" within its own lane and the dust he saw. [Tr. 46]. The Court finds that this alone cannot constitute the basis for reasonable suspicion that Ms. Pace was committing a crime.

With respect to the roadway lane violation, on a two lane divided road such as the Spur, Tennessee Code Annotated § 55-8-123 provides:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:(1) A vehicle shall be driven <u>as nearly as practicable</u> entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Tenn. Code Ann. 55-8-123 [emphasis added].

The Tennessee Supreme Court has applied this statute to particular driving behaviors alleged to have constituted a violation, concluding that, "[I]f failure to follow a perfect vector down the highway ... [was] sufficient reason[ ] to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." <u>State v. Binette</u>, 33 S.W.3d 215, 219 (Tenn.2000) (quoting <u>United States v. Lyons</u>, 7 F.3d 973, 976 (10th Cir.1993)). <u>Binette</u> also cautions that hyper-technical driving requirements can create a "stop at will" standard violative of the Fourth Amendment. <u>Binette</u>, 33 S.W.3d at 219-20. <u>Accord</u>, <u>State v. Richie </u>2007 WL 10449 (Tenn.Crim.App., 2007). Nor is <u>Binette</u> an anomaly; Tennessee

courts have had repeated occasion to address the relationship between "weaving" and Tennessee traffic laws. See e.g., State v. Puckett, WL 21638048 (Tenn.Crim.App. 2003) (declining to "consider the costs of drunk driving against the limited intrusion upon motorists who themselves are put at risk by drunk drivers" as urged by the state, holding that where defendant's vehicle "touch[ed] the right white line, proceed[ed] a considerable distance in her lane, … eventually either crossing or going on the left white line" before the stop did not constitute a violation); State v. Martin, WL 1273889 (Tenn. Crim. App. 2000) (reasonable suspicion justifying the stop of a vehicle "does not spring into existence" simply because vehicle in the vicinity of drinking establishments during late hours of the night is operated in "less than perfect fashion," vehicle briefly crossing solid white line on shoulder not a traffic violation.)

This Court finds Tennessee courts' application of Tennessee law persuasive as to the facts of this case. The statutory language includes a consideration that certain factors that may affect driving without constituting a violation of the law, as evidenced by the caveat provision "as nearly as practicable." This language has been addressed also by the Sixth Circuit. In United States v. Freeman, 209 F.3d 464 (6th Cir. 2000), a motor home was stopped after an officer observed it drift across the fog line onto the shoulder portion of a roadway. The Sixth Circuit concluded that there had been no violation of the Tennessee lane law:

> We can not, however, agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane "as nearly as practicable"...Just as it does not constitute probable cause that a traffic violation occurred, the motor home's brief entry into the emergency lane does not constitute probable cause that Adams was intoxicated.
>
> Freeman, 209 F.3d at 466 (Citing with approval, United States v. Gregory, 79 F.3d 973, 978 (10th Cir.1996) holding that a similar one-time entry into the emergency lane failed to constitute a

> violation of a Utah statute which the Sixth Circuit found to be nearly identical to Tennessee Code Section 55-8-123).

The Freeman court applied a probable cause standard to that traffic stop. Nonetheless, this Court finds Freeman's treatment of the Tennessee statute, taken with the clarity of the state court interpretation of the language "as nearly as practicable," and the testimony before the Court regarding the nature of the roadway supports the conclusion that the officer did not hold the requisite reasonable suspicion that the Mercury committed a violation of this statute; nor did the officer hold the requisite reasonable suspicion that the driver was under the influence. The United States Supreme Court has noted that "[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, non-technical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas, 590 U.S. at 695 (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Despite the distinctions in the standard, since the Court finds no reasonable suspicion, the higher probable cause standard applied by the Sixth Circuit in Freeman certainly cannot be met under these facts and circumstances. In fact, the stop herein appears to the Court to have been based more on an impermissible "hunch," couple with the fact that the defendant's vehicle was about to exit the Ranger's jurisdiction.

Fleming testified that the incident was observed within a sharp curve, after a series of sharp curves, and that he did not actually see the car's wheels travel off the roadway. The Court concludes that even if Ms. Pace's wheels, in fact, briefly and insignificantly traveled over the fog line in the single incident described, both Tennessee courts and the Sixth Circuit indicates that this does not constitute a violation of a traffic law.

Further, the stop in question cannot be based upon a mistaken belief in law on the part of the officer because a mistake regarding the applicable law cannot provide the objectively reasonable grounds for providing reasonable suspicion or probable cause. See United States v McDonald, 453 F 3d 958 (7th Cir. 2006) (which held that a stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not objectively reasonable).

The Court, therefore, finds that Ranger Fleming's observation of the defendant's vehicle movement within its own lane, and the testimony regarding her vehicle's kicking-up dust briefly is insufficient to give rise to either a reasonable suspicion, based on specific articulable facts, or probable cause of a traffic violation, including the charged DUI, and as such constitutes an unreasonable invasion of Ms. Pace's Fourth Amendment rights.

Because Ranger Fleming's stop of the Mercury was not justified at its inception, all evidence obtained pursuant to the stop, including any statements made by the defendant, must be suppressed as fruit of the poisonous tree.

### III: CONCLUSION

For the reasons stated herein, Motion to Suppress **[Doc. 2]** is **GRANTED**.

**IT IS SO ORDERED.**

ENTER:

  s/ C. Clifford Shirley, Jr.  
United States Magistrate Judge